474 So.2d 673 (1985)
George F. SELF, Jr.
v.
J.O. BENNETT, et al.
Ernest E. GARNETT, Sr.
v.
The TRAVELER'S INSURANCE COMPANY, et al.
Mary L. MOON
v.
LIBERTY MUTUAL INSURANCE COMPANY, et al.
83-334, 83-337 and 83-375.
Supreme Court of Alabama.
July 12, 1985.
Leon Garmon, Gadsden, for appellants.
Donald D. Lusk of McDaniel, Hall, Parsons, Conerly, Scott & Lusk, Birmingham, for appellees J.O. Bennett, etc., and Corporate Group Service of Ala., Inc. (83-334).
F. Michael Haney of Inzer, Suttle, Swann & Stivender & Jack Torbert, Gadsden, for appellees The Traveler's Ins. Co. (83-334) and Liberty Mutual Ins. Co. (83-375).
BEATTY, Justice.
Affirmed on the authority of Meeks v. Opp Cotton Mills, Inc., 459 So.2d 814 (Ala. 1984); Garvin v. Shewbart, 442 So.2d 80 (Ala.1983); and Waldon v. Hartford Insurance Group, 435 So.2d 1271 (Ala.1983).
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, ALMON, SHORES and ADAMS, JJ., concur.
JONES, J., concurs in the result.
EMBRY, J., dissents.
EMBRY, Justice (dissenting).
Each of the three appellants in these consolidated cases is a worker who claims he or she was injured while engaged in the performance of duties of employment and from a cause originating from that employment. Each alleges he has suffered partial permanent disability and each has attempted to assert his rights under Alabama's Workmen's Compensation Act. Their stories, as set forth in the records on appeal, are as follows:

ERNEST E. GARNETT, SR.
On 31 January 1983, Ernest E. Garnett, Sr., injured his back while working at AAA Plumbing and Pottery Company (AAA) in Attalla, Alabama. As he left the plant that day, Garnett notified his employer he had injured his back.
On the night of the 31st, around 10:00 p.m., because of excruciating pain, fire medics were called to Garnett's home to *674 transport him to the hospital. When he arrived at the hospital, Garnett informed an orthopedic surgeon, Dr. Jack Reagan, that he had injured his back when he slipped at work.
After spending three weeks in the hospital in Gadsden, Garnett was discharged and referred to an orthopedic surgeon, Dr. Richard Nasca, at UAB Hospital in Birmingham, Alabama. Nasca performed back surgery on Garnett in April of 1983. After surgery and a partial recovery, Nasca informed Garnett he had suffered a permanent partial disability.
Garnett's complaint stems from problems which arose from his attempt to recover workmen's compensation benefits. As noted, Garnett gave his employer immediate notice that he was injured on the job. Further notice to the company included calls to Deborah Lynn Thompson, AAA's employee responsible for filing workmen's compensation claims; a telephone call to Joe Woods, Garnett's immediate supervisor, concerning the claim, three days after the accident; a conversation concerning the claim during visits by two supervisors from AAA to Garnett during Garnett's hospital stay; and three letters from Garnett's attorney, Leon Garmon, dated 22 February 1983, 5 March 1983, and 16 March 1983, to AAA on Garnett's behalf.
Garnett contends the plant superintendent, James Neumann, prevented the proper parties at AAA from filing notice of his claim with the company's compensation carrier, Traveler's Insurance Company (Traveler's), and that notice to Traveler's was not filed before 1 July 1983, when Garnett filed suit against AAA.
Garnett further alleges that, after Traveler's had notice of his claim, the carrier, conspiring with AAA, continued to deny his claim, and intentionally refused to pay it without lawful basis. He contends they attempted to starve him out and force him to accept a lesser amount than was due under the workmen's compensation provisions.
His amended complaint includes claims for wrongful refusal to pay workmen's compensation insurance benefits; conspiracy and collusion on the part of AAA and Traveler's to deny benefits to the claimant; intentional infliction of emotional distress; breach of contract; and the tort of outrage. Based on this court's decision in Waldon v. Hartford Insurance Group, 435 So.2d 1271 (Ala.1983), the trial court dismissed all claims against Traveler's and granted summary judgment in favor of AAA on every claim except the issue of benefits due under the Workmen's Compensation Act.
Garnett filed a motion for an expedited hearing on the remaining claim due to his dire financial circumstances. (Garnett was receiving $20 per week from an independent disability insurance policy, and food stampsas his only income.) The request was granted and a hearing was scheduled for 23 September 1983. AAA requested a continuance, which was granted. The case was heard on 7 October 1983.
The trial court entered an order, on 10 November 1983, granting temporary total disability benefits to Garnett from 31 January 1983 until the time he was released to return to work by Dr. Nasca. When this appeal was filed, Dr. Nasca had not released Garnett to return to work. AAA requested that the trial court reconsider its order and a hearing date was set on that motion for 18 January 1984.
Meanwhile, AAA approached Garnett and offered to give him immediate payment of benefits due if he would consent to a modification of the trial court's finding that his injury occurred on the job. He elected instead to wait for the trial court's denial of the motion for reconsideration. On 13 February 1984, more than a year after his accident at AAA had occurred, Garnett received his first check for workmen's compensation benefits.

MARY L. MOON
Mary L. Moon was injured at her place of employment, G.C. Murphy Company (Murphy) in Gadsden, Alabama, on 29 February 1980. She gave her employer prompt notice *675 of her injury and was treated by the company physician, Dr. John Keeling.
During the next two years, Moon made periodic attempts to return to her employment, but, because of pain, she could not satisfactorily perform her duties. These attempts were made while Moon was under the care of Dr. Keeling, and also her own family physician and a chiropractor. In July of 1981, Moon was working at G.C. Murphy on "light duty status" when she took vacation leave because of her pain. While she was home on leave, the company notified her by telephone that she was being placed back on disability leave. After Moon's vacation leave was up, her disability benefits were not renewed. When Moon contacted Murphy to inquire about her disability payment, she was informed the company would contact Liberty Mutual Insurance Company (Liberty Mutual), Murphy's workmen's compensation carrier.
In October of 1981, a claims supervisor for Liberty Mutual informed Moon that the company would not pay any further disability benefits until she submitted to a myelogram examination.
Moon was referred by Liberty Mutual to Dr. J. Clayton Davie, the neurologist who conducted the test. During Moon's hospitalization for the myelogram, Davie requested that a clinical psychologist, Dr. Lee M. Coleman, conduct various psychological tests and evaluations. The stated purpose of this testing was to rule out the possibility of any psychological or emotional component being a part of the back pain described by Moon. Dr. Coleman determined there was no emotional component contributing to Moon's pain and that her pain must originate from either "physical or organic" elements.
Davie did not request a second opinion from another psychologist, but advised Moon her myelogram appeared normal and released her to return to work.
Moon informed the company of Davie's evaluation of her myelogram and his opinion that she should be able to return to work with no restrictions as to duties. Moon was then informed by Margaret Carr, of Murphy, that she must receive a release from Keeling, the company physician, in order to return to work. Keeling refused to grant that permission except under "light duty" status.
When Moon reported to Carr the doctor's decision, Carr advised her there were no "light duty" jobs available at G.C. Murphy and that she would again be placed on disability leave.
Moon received disability benefits until November 1981, when, suddenly, they were discontinued. When Moon contacted Liberty Mutual to find out why, she was informed the company doctor had released her to return to work with no restrictions.
Moon returned to work but was not able to perform her duties due to pain. Her supervisor again sent her to the company doctor, who then sent her to an orthopedic surgeon, Dr. L.R. Lonnegan. Lonnegan made X-rays and examined Moon. He advised her to return to work and try to schedule her work around her pain. Moon tried again to return to work but was not able to perform her duties due to the pain and requested an approved leave of absence.
On 31 March 1982, Moon received the following notice that she was fired:
"Based on the statements of the physicians involved, there is no justification for granting another approved leave of absence. Since you are unwilling to perform the work available at the store, there is no choice but to terminate your employment with the G.C. Murphy Company, effective with the date of this letter.
"Please be advised that Workers' Compensation claims are not handled by employees of the G.C. Murphy Company. Any inquiries of this nature should be directed to Liberty Mutual, P.O. Box 7505A Birmingham, Alabama 35253."
After being discharged by Murphy, Moon saw Dr. Thomas Staner at Brookwood Hospital in Birmingham and Dr. Richard Nasca of the University of Alabama Hospital at Birmingham. Both physicians determined *676 that Moon's myelogram was in fact "abnormal" and that she had a herniated disc. Moon submitted to surgery on 7 April 1983.
Dr. Nasca testified on deposition that Moon's condition was known as "spinal canal stenosis" and was consistent with the type of injury suffered by Moon at G.C. Murphy in February of 1980.
Nasca further stated that Davie "could have diagnosed and probably should have diagnosed" the spinal canal stenosis found in Moon. He stated, "I think her case is pretty obvious. I think just looking at the X-rays you can tell that there is a great deal of change there at L-4/L-5 and L-5/S-1 level."
Moon retained an attorney who, on 10 May 1982, notified Liberty Mutual and G.C. Murphy Company that, unless they settled Moon's workmen's compensation claim, suit would be filed. In June, Moon filed suit against Murphy and Liberty Mutual alleging wrongful refusal to pay temporary total disability benefits; collusion and conspiracy to deprive Moon of benefits by discharging her on 29 March 1982; intentional infliction of emotional distress; breach of contract by Liberty Mutual; and the tort of outrage. The trial court severed the claims against G.C. Murphy from those against Liberty Mutual and, based on this court's interpretation of the Workmen's Compensation Act's exclusivity provision in Waldon v. Hartford Insurance Group, 435 So.2d 1271 (Ala.1983), granted summary judgment in favor of Liberty Mutual. Moon appeals that court's grant of final summary judgment.

GEORGE SELF
George Self contends he was injured while fulfilling the duties of his employment with J.O. Bennett Lumber Company (Bennett Lumber) on 13 May 1982. Self promptly received benefits from his employer's workmen's compensation carrier, Corporate Insurance Group Service of Alabama, from 13 May 1982 through 7 July 1982, when the benefits were abruptly discontinued.
On 7 July 1982, when Self went to the premises of his employer, to inquire as to the reason for the termination of his benefits, he was informed by James Bennett, of Bennett Lumber, that he was fired. The reasons given for Self's termination by Bennett were that Self would not return to work and, as stated by Bennett, "You are causing our insurance rates to go up because of your back injury."
On 6 July 1983, Self filed an action for workmen's compensation benefits against Bennett Lumber. In addition, he stated tort claims against Bennett Lumber and Corporate Insurance for wrongful refusal to pay benefits; bad faith breach of contract; conspiracy and collusion between the defendants to deprive him of workmen's compensation benefits; intentional infliction of emotional distress; and the tort of outrage.
A motion for summary judgment, based on this court's decision in Waldon v. Hartford Insurance Group, supra, was filed on behalf of the carrier and Bennett Lumber. Summary judgment was granted as to all claims except Self's claim for workmen's compensation benefits. Self appeals that grant of final summary judgment.
These cases reveal a pattern of inequities caused by this court's current interpretations of the exclusivity provision of Alabama's Workmen's Compensation Act, and the employment-at-will doctrine.

I
First, because there are clearly inequities relative to the mechanics of recovery under Alabama's Workmen's Compensation Act, and it appears that those inequities are encouraged, in part, by this court's recent interpretation of the exclusivity provision of the Act, I would reconsider our decision in Waldon v. Hartford Insurance Group, 435 So.2d 1271 (Ala.1983).
In Waldon, this court held that an independent tort action of an employee against the employer or workmen's compensation insurance carrier for bad faith in processing or paying claims was barred by the exclusivity provisions of the Workmen's *677 Compensation Act. Waldon, 435 So.2d at 1273.
The exclusivity provision precludes workers from bringing claims outside the Act when such claims arise from work-related injuries. It provides:
"No employee of any employer subject to this article, nor the personal representative, surviving spouse or next of kin of any such employee shall have any right to any other method, form or amount of compensation or damages for any injury or death occasioned by any accident proximately resulting from and while engaged in the actual performance of the duties of his employment and from a cause originating in such employment or determination thereof other than as provided in this article." (Emphasis added.)
§ 25-5-52, Code 1975.
"The immunity from civil liability shall extend to any workmen's compensation insurance carrier of such employer...."
§ 25-5-53, Code 1975.
This court's holding in Waldon was that the common-law bad faith action is so interwoven with the employee's right to compensation that to permit a separate action would circumvent the purpose of the exclusivity provision of the Act.
The exclusivity provision was again the subject of interpretation when, in Garvin v. Shewbart, 442 So.2d 80 (Ala.1983), this court held the tort of outrage is not barred by the exclusivity provision of the Act. In Garvin, we distinguished our holding in Waldon by stating that, while a bad faith claim in a workmen's compensation action is interwoven with the employee's right to compensation, outrageous conduct is a separate tort which allows a separate recovery. Garvin, 442 So.2d at 83.
To reconsider whether the exclusivity provision of the Act limits the worker's right to bring a common law action for the tort of bad faith, I will explore the Act, and also the legislative intent relative to the Act.
Alabama's Workmen's Compensation Act provides a remedy to employees who sustain injuries on the job irrespective of fault. The rationale behind the Act is that workers accept smaller recoveries than those potentially available at common law in return for coverage of all work-related injuries regardless of fault. In other words, the claimant has given up his right to pursue a larger recovery in a civil action in return for certain and swift recovery.
The Act also benefits industry in that, in contrast to greater damages that are awarded for serious personal injuries in tort or products liability actions, Alabama's worker's compensation statutes set a maximum compensation at 50-66% of the workman's average weekly wage and a minimum compensation of 25%. Further, the exclusivity provision of the Act limits the workmen's right to sue outside the Act.
Traditionally, disputes over payment of workmen's compensation claims have been resolved through the exclusive remedies provided by the workers' compensation statute. A 10% penalty may be imposed under the Act for a delay in payment. (As can be observed from the facts alleged in these cases on appeal, the penalty provision in the Act is a questionable deterrent to late payment.)
A number of courts have concluded that the workmen's compensation statute's exclusive remedy provision will not bar a separate tort action for the intentional wrongdoing in connection with the investigation and payment of claims and that the penalty statute does not provide the sole remedy. See Stafford v. Westchester Fire Insurance Co., 526 P.2d 37 (Alaska 1974); Unruh v. Truck Exchange, 7 Cal.3d 616, 102 Cal.Rptr. 815, 498 P.2d 1063 (1972); and Martin v. Travelers Insurance Co., 497 F.2d 329 (1st Cir.1974). I consider the issues explored in these cases relevant to reconsideration of Waldon.
The exclusivity provision of the Act is subject to various interpretations. The Act does not expressly grant immunity to actions alleging intentional tortious conduct. Therefore, it is clear that the Legislature *678 intended that the judiciary have the discretion to decide whether a common-law action relative to a particular injury is barred by the exclusivity provision of the Act. That provision limits a claimant to recovery under the Act when the injury alleged is a "proximate result" of injury or death while "engaged in the actual performance of the duties of ... employment."
The damage which is the basis of these suits did not arise out of or in the course of the plaintiffs' employment, nor as a proximate result of the plaintiffs' injury. Instead, the damage was allegedly incurred because of the intent of the tortfeasor to cause injury and damage to the plaintiffs. Under a literal interpretation of the Act's exclusivity provisions, the intent of the tortfeasor is an intervening cause which removes the intentional tort from the operation of the provisions. We approached this rationale in Garvin, 442 So.2d at 83, when we stated that outrageous conduct is a separate tort which creates a separate injury. We did not, however, carry that rationale to its logical conclusion by holding that, because of the genesis of intentional torts (the intent of the tortfeasor), they are separate torts which allow separate recoveries.
Second, the Alabama Constitution of 1901, Art. 1, § 13, declares "that all courts shall be open; that every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due process of law." The Workmen's Compensation Act is, of course, a voluntary substitute for common law applicable to those who elect to come within its provisions. Gentry v. Swann Chemical Co., 234 Ala. 313, 174 So. 530 (1937). It is this elective option between employer and employee that reconciles the Act with § 13 of the Constitution. Chapman v. Railway Fuel Co., 212 Ala. 106, 101 So. 879 (1924). That election is made upon the basis of a quid pro quo between employer and employee. Each voluntarily gives up rights guaranteed by § 13 in exchange for benefits or protection under the Workmen's Compensation Act.
It is highly unlikely that an intentional tort by an employer or carrier is contemplated by the reasonable employer or employee as part of the employment relationship. Therefore, the resultant injury would not arise out of employment and, as a result, the employee should retain his right to a common law action for an intentional tort.
Third, I consider the intent of the legislature relative to the creation of the workmen's compensation system, as discerned from the provisions of the Act and its history. The Act contains a penalty provision, Code 1975, § 25-5-59, which, appellees argue, was intended by the Legislature to be the exclusive remedy for harm resulting from late payment. The character of the penalty provisions within the present worker's compensation scheme is such that it is especially applicable to kinds of conduct which are not intentional. However, it may be triggered by intentional wrongdoings or the presence of bad faith, such as cases of mismanagement or deficient administrative practices, where intentional wrongdoing is involved, that conduct cannot be expiated by penalty payments in the amount of 10%. See Coleman v. American Universal Insurance Co., 86 Wis.2d 615, 273 N.W.2d 220 (1979).
There are a number of other indications of legislative intent relative to this issue. The primary objective of workmen's compensation laws is to provide certain and swift payment to injured workers or dependents of deceased workers who, in return for such a recovery, have forfeited their rights to bring a regular civil action for a larger recovery. The injured compensation claimant and the insurer occupy relative positions which are analogous to the insurer-insured relationship at the heart of the tort of bad faith. The workmen's compensation statutes impose liability on the employer to pay disability benefits to an injured worker, and make recovery under the statute the employee's exclusive remedy.
Under these circumstances, it is reasonable for the employee to expect fair dealing, *679 and it is not unreasonable to impose that duty upon the employer and the carrier. Tort claims against compensation carriers for wrongful delay or refusal to pay compensation promote the effectiveness of the compensation system by enforcing the workers' exclusive remedy when the insurer intentionally seeks to thwart that remedy.
Deprived of the bad faith theory, the workers' compensation claimant often cannot claim the benefits of tort law. The standard of proof required for the tort of outrage cannot be met in the typical case of delay or refusal to pay. In those cases, under the present law, employers and carriers can hide behind the shield of exclusivity with impunity, withholding benefits for undeniably compensable injuries until ordered to pay benefits. That result comports with neither the intent of the Act nor the public interest.
Last, I must note that our workmen's compensation system is basically an insurance scheme, and to insure against intentional torts is against public policy.
For the above reasons, remembering Justice Frankfurter's admonition that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes too late," Henslee v. Union Planters Bank, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (dissenting opinion), I would overrule Waldon v. Hartford Insurance Group, supra, to the extent it holds the exclusivity provision of Alabama's Workmen's Compensation Act bars a cause of action for the tort of bad faith.

II
Second, and again considering Justice Frankfurter's admonition, I examine another advantage used by the employer in the workmen's compensation negotiation processretaliatory discharge. I need not recount the bitter fruits of the employment-at-will doctrine. Two of the cases in this consolidated appeal represent the inequity of the rule. There have been hundreds like them.
If workmen's compensation laws are to be fully protective of an employee's rights, we must recognize that it is unconscionable and contrary to public policy for an employee to have to choose between compensation and continued employment. For that reason, numerous courts have given workers a judicially created tort remedy for retaliatory discharge. See e.g., Clanton v. Cain Sloan Co., 677 S.W.2d 441 (Tenn.1984); Brown v. Transcon Lines, 284 Or. 597, 588 P.2d 1087 (1978); Sventko v. Kroger Co., 69 Mich.App. 644, 245 N.W.2d 151 (1976); Murphy v. City of Topeka-Shawnee Cty. Dept. of Labor Services, 6 Kan.App.2d 488, 630 P.2d 186 (1981); Lally v. Copygraphics, 85 N.J. 668, 428 A.2d 1317 (1981); Hansen v. Harrah's, 675 P.2d 394 (Nev.1984); Smith v. Piezo Technology & Prof. Adm'rs', 427 So.2d 182 (Fla.1983); Firestone Textile Co. Div., Firestone Tire and Rubber Co. v. Meadows, 666 S.W.2d 730 (Ky.1984). "In addition, California, Hawaii, Maine, Maryland, Minnesota, Missouri, New York, North Carolina, Ohio, Oklahoma, Texas and Wisconsin have by statute given workers either an administrative or judicial remedy for retaliatory discharge." Clanton, supra, 677 S.W.2d at 444.
Retaliatory discharges completely circumvent the legislative scheme reflected in our workers' compensation law. Therefore, in order to enforce the duty of the employer, secure the rights of the employee, and carry out the intention of the Legislature, I would recognize a cause of action in tort for retaliatory discharge when a workman asserts the right to workmen's compensation benefits and would allow recovery of actual and punitive damages resulting therefrom.

III
Last, because it appears the trial court determined that plaintiffs' claims for the tort of outrage and the intentional infliction of emotional distress were barred by the Act's exclusivity provision, I would decline to consider whether the facts presented by each appellant support such a cause of action.
*680 It is, of course, the plaintiffs' burden to make out a case of outrageous conduct by showing behavior which is "utterly intolerable in a civilized society." Cates v. Taylor, 428 So.2d 637 (Ala.1983). I would deem it appropriate to withhold determination of this issue in order to allow reevaluation of the facts by the trial court in light of Garvin, supra, if these cases had been reversed.